IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


BENJAMIN JAMES WEFLER,         )  Civil No.: 6:14-cv-00331-JE
                                  )
            Plaintiff,        )  FINDINGS AND
                                  )  RECOMMENDATION
           v.              )
                                  )
CAROLYN W. COLVIN,             )
Acting Commissioner of Social Security,   )
                                )
            Defendant.     )
_____  )

      Kathryn Tassinari
      Mark Manning
      Harder, Wells, Baron & Manning, P.C.
      474 Willamette, Suite 200
      Eugene, OR 97401

            Attorneys for Plaintiff

      Billy J. Williams, Acting U.S. Attorney
      Janice Hebert, Asst. U.S. Attorney
      1000 S.W. 3rd Avenue, Suite 600
      Portland, OR 97204

      Thomas Elsberry, Special Asst. U.S. Attorney
      Office of the General Counsel
      Social Security Administration
      701 5th Avenue, Suite 2900 M/S 901
      Seattle, WA 98104-7075

            Attorneys for Defendants

FINDINGS AND RECOMMENDATION – 1

JELDERKS, Magistrate Judge:

Plaintiff Benjamin Wefler brings this action pursuant to 42 U.S.C. §405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for supplemental security income (SSI) under the Social Security Act (the Act). Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits.  In the alternative, he seeks an Order remanding the action for further proceedings.

For the reasons set out below, the Commissioner's decision should be affirmed.

## Procedural Background

Plaintiff filed an application for SSI benefits on August 28, 2009, alleging that he had been disabled since November 11, 2006 because of obsessive compulsive disorder (OCD), cognitive impairment, autism and a learning disability.

After his claim was denied initially and on reconsideration, Plaintiff requested an administrative hearing.

On October 11, 2012, a hearing was held before Administrative Law Judge (ALJ) John Madden, Jr.  Plaintiff; Plaintiff's mother; and C. Kay Wise, a Vocational Expert (VE), testified at the hearing.

In a decision filed on December 4, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  That decision became the final decision of the Commissioner on December 27, 2013, when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff challenges that decision.

## Background

Plaintiff was born in 1988 and was 24 years old at the time of the ALJ's decision.  He

graduated from high school and has no past relevant work.

### Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is

FINDINGS AND RECOMMENDATION – 3

not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the

Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R.

§ 404.1520(f).

Step Five.  The Commissioner determines whether the claimant is able to do any other

work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that

the claimant is able to do other work, the Commissioner must show that a significant number of

jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this

burden through the testimony of a vocational expert (VE) or by reference to the Medical-

Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner

demonstrates that a significant number of jobs exist in the national economy that the claimant

can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant

is disabled.  20 C.F.R. § 404.1520(g)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy.  Id.

## **Medical Record**

In September 2007, Plaintiff was seen, accompanied by his mother, by Dr. P. Randall

Frank, M.D.  Dr. Frank noted that Plaintiff had a successful conclusion of his school year and his

anxiety and obsessional thinking had diminished. Plaintiff reported he had obtained a job

delivering papers and was encouraged to continue with this job and with his voice and piano

lessons.

In notes of a visit dated April 7, 2008, Plaintiff reported feeling more discouraged.  He

had moved out of his mother's house and was living with friends.  There was a relative lack of

structure in his life and he was feeling more dysphoric but admitted he was staying up very late at night.  He was no longer working on his paper route and his mother reported that he was "discouraged over his poor choices this year during school and in his living arrangements."

During a visit on June 27, 2008, Plaintiff reported he continued to live in a friend's home but was much more focused on maintaining well-regulated sleep, diet and exercise habits and attending community college. Dr. Frank noted that Plaintiff's current diagnoses adversely impacted learning and that paperwork to request accommodations at the community college was completed.

In April 2009, Plaintiff was examined at Laurel Hill Center for an Initial Mental Health Assessment in part to help with career goals.  He was assessed with obsessive compulsive disorder (OCD) and panic disorder without agoraphobia. Plaintiff reported that his last job was in a pizza restaurant but that he had not been able to keep up with the required production rate and was let go after three weeks. He tended to put off following up on job listings his mother sent him.  He told counselors his passions were in the area of music and drama and he had a long range goal of completing a degree in performing arts.  Plaintiff reported he enjoyed a fairly active social life and enjoyed "stick fighting" with his friends.  Plaintiff reported that he had long been troubled by excessive rumination, second-guessing decisions and overthinking situations. Counselors concluded that Plaintiff had marked barriers to choosing and getting a community job but that he "was aware of and articulate about those barriers and sought support in overcoming them in order to achieve gainful employment and a career."

In notes of a visit dated June 22, 2009, Dr. Frank remarked Plaintiff's visit was prompted by the fact that he had had refused to refill his medications because he had not seen Plaintiff in almost a year. Plaintiff reported that he had taken an average of six credit hours per quarter over

the previous school year and had done reasonably well in the first two quarters but fell behind in the Spring. Plaintiff reported that mathematics was his greatest challenge.  Plaintiff and his parents had decided that he was in "an unhealthy living situation" at his long-time friend's house and that Plaintiff was now living with three roommates.  This new living situation allowed Plaintiff to consolidate his routines but he continued to stay up most of the night and sleep most of the day.  Dr. Frank noted that "this has interfered significantly with his attendance at class, as well as interviews for work or even presenting for volunteer positions."  He also noted that Plaintiff could be inconsistent with his medication administration.  Dr. Frank recommended that Plaintiff wake up at the same time every day and got to bed at the same time every evening.

In treatment notes dated August 31, 2009, Plaintiff and his mother reported that his depression had become worse with the medication changes implemented on his last visit but that the mother's readjustment of his medications had resulted in improved mood, energy and anxiety.  Dr. Frank noted that Plaintiff had had significant difficulty with taking six credit hours at the community college.  Dr. Frank was in agreement with Plaintiff's mother that this was due to Plaintiff's "completely disorganized lifestyle, to include sleep habits, lack of exercise, and poor dietary habits."  Dr. Frank noted that Plaintiff was still obsessional and had a hard time seeing himself adhering to a regular schedule. Dr. Frank recommended improved diet, and consistent sleep and exercise habits.

During a visit on December 4, 2009, Plaintiff reported feeling increasingly depressed, "anergic,"[1] inattentive to personal hygiene and spending his time in a socially isolated state.  He continued to describe fears and occupations with demons but had no specific thoughts of wanting to harm himself or others.  Dr. Frank noted that Plaintiff was inconsistent in taking his

---

[1] I do not find an appropriate definition for this term and assume that Dr. Frank uses it to describe a lack of energy.

medications. He also noted that Plaintiff had two drama performances/final examinations that he needed to complete that afternoon and the next day and that he was working sporadically at "The Shedd" as a production assistant.  Dr. Frank strongly recommended Plaintiff come in for hospitalization but Plaintiff did not want to miss his final exams.  Plaintiff agreed to follow up in 7 to 10 days if he was doing well and to return sooner for hospitalization if he experienced an acute deterioration.

The following week Plaintiff reported that he had completed all of his final exams, his performance in the Shakespearean dramas had gone well, he was sleeping more soundly and regularly, was no longer experiencing thoughts of self-harm or harm to others and was working at The Shedd.  He continued to complain of intrusive thought of demons and reported that watching certain horror movies triggered these thoughts.

During a visit with Dr. Frank on December 28, 2009, Plaintiff rated himself as "modestly improved." He reported that his worries and obsessions about demons had decreased and he was avoiding movies that triggered these thoughts.

In notes of a visit dated January 29, 2010, Dr. Frank remarked that Plaintiff continued to make modest progress, was trying to make his classes each day, had obtained a part in a Shakespeare play and was working at The Shedd.

During a visit on February 26, 2010, Plaintiff reported fewer episodes of severe anxiety. He was attending play rehearsals on a regular basis and was interested in perfecting his music and attending class regularly.  Dr. Frank noted that Plaintiff continued to forget about appointments but that, generally, Plaintiff was continuing to improve.

On March 31, 2010, Plaintiff saw licensed psychologist William McConochie, Ph.D. for a consultative evaluation.  Plaintiff reported anxiety disorder, obsessive thoughts and sleep

FINDINGS AND RECOMMENDATION – 7

difficulties. He described feeling depressed because he didn't feel he had that much control over his life. Testing on the WAIS-IV showed intellectual function in the low average range just above the borderline range with a full-scale IQ of 80.  Dr. McConochie diagnosed Generalized Anxiety Disorder and Dysthymic Disorder.  He opined that Plaintiff had only mild impairments in understanding and remembering instructions and sustaining concentration, attention and persistence and no impairments to engaging in appropriate social interaction.  He concluded that Plaintiff's primary psychological limitations to work activity were his modest intelligence, depression and general anxiety.  Dr. McConochie noted that despite his difficulties, Plaintiff was succeeding both at the local community college in simple classes and in a part-time job at a local performing arts center.

In May 2010, Plaintiff began psychotherapy sessions with Arthur Kearney, a psychiatric mental health nurse practitioner.  Plaintiff reported difficulty getting to sleep and then getting up to attend school.  He was enthusiastic about his involvement in the community college acting program. He was writing a play that he intended to help produce and act in as the title character. Kearney listed Plaintiff's diagnoses as Major Depressive Disorder, recurrent, mild to moderate at this time and Obsessive Compulsive Disorder well controlled with medication and nonpharmacological coping mechanisms.

During a visit on June 17, 2010, Plaintiff reported he had been hired for a professional theater performance and was preparing for that work.  His primary problem was difficulty getting to sleep but he admitted failing to use Seroquel as directed. In July, Plaintiff reported that he was very active in rehearsals, which ended late at night and he continued to have difficulty going to sleep. Kearney opined that insufficient quality and quantity of sleep and Plaintiff's prescription Luvox were likely contributing to daytime lethargy.

In October 2010, Plaintiff reported to Kearney that he had been doing well until an episode when he experienced anxiety related to a cast party that was to follow one of the theater productions in which he was involved. Plaintiff reported he had concerns about the crowds and the presence of alcohol and had left the theater at intermission. He reported additional anxiety stemming from the change in his academic course schedule.

In notes from a visit dated February 14, 2011, Kearney remarked that Plaintiff's primary complaint was increased anxiety. He noted that Plaintiff's mother initially responded to questions and was interrupted on several occasions by Plaintiff who indicated that his symptoms were not as severe as his mother was presenting. Plaintiff reported that he was rehearsing for a very difficult position in a play and attending full-time community college classes. He admitted his feelings of being overwhelmed were causing his increased anxiety. Plaintiff reported he had delayed his follow-up visits because he had been doing well.

In notes of visits with Kearney dated March 14, 2011 and May 9, 2011, both Plaintiff and his mother agreed that Plaintiff was doing much better. Plaintiff endorsed a significant decrease in symptoms of obsessive compulsive thoughts and behavior and significant reductions in anxiety and depression.

In March and April of 2011 Dr. Craig Thorsen, Ph.D., completed a Psychological Evaluation report. He noted that Plaintiff was referred for an updated comprehensive assessment to assist with treatment planning, to help identify accommodations for him in college and in work and to recommend independent living resources for him. Dr. Thorsen completed a review of records and administered and reported findings based on a mental status examination, the Conner's Continuous Performance Test (CPTII), the Wechsler Adult Intelligence Scale (WAIS-III), the Woodcock-Johnson Tests of Achievement (WJ-III), the Beck Depression Inventory

(BDI-II), the Brief Symptoms Inventory (BSI), the Gillberg Diagnostic Criteria for Autistic Spectrum Disorder, and the Adaptive Behavior Assessment System (ABAS-II). The last two of these assessments were completed by Plaintiff's mother.

In August 2011, Plaintiff transferred care to psychiatrist Dr. Regina McGlothlin. Plaintiff wanted to discuss his OCD. He also reported having panic attacks and fear of demonic possession. Dr. McGlothlin noted that Plaintiff's presentation was neat and clean, he maintained appropriate eye contact, and was calm and cooperative. His affect appeared somewhat constricted but thought processes were logical, coherent and goal directed.

During a visit with Dr. McGlothlin on October 17, 2011, Plaintiff reported continued panic attacks associated with having seen the movie "The Exorcist." He reported experiencing "weird thoughts," withdrawing and becoming irritable. He stated that he "sits around and ruminates how lazy, how low, how useless he is."

In November 2011, Plaintiff's mother accompanied him during his visit with Dr. McGlothlin.  She reported that "this is the best she had seen [Plaintiff] functioning." He had qualified for developmental disability support at the community college and had gotten the roles of Puck and Iago in plays at the college. Plaintiff reported feeling melancholy, angry and depressed and had to "work hard to get out of these moods."

In treatment notes dated December 8, 2011, Plaintiff reported that he was anxious and depressed.  His mother commented that he had finished the school term, had received good grades and did well in two plays.  Dr. McGlothlin and Plaintiff discussed structuring his life, planning activities for himself and addressing bad habits one at a time. She recommended increasing his dosage of Seroquel to lift his mood.

FINDINGS AND RECOMMENDATION – 10

In forms dated September 12, 2012, Dr. Thorsen responded to questions and completed a checkbox Mental Residual Function Capacity Assessment (MRFCA) provided by Plaintiff's attorney.  He stated that he provided Plaintiff with cognitive-behavioral and problem-solving therapy focused on anxiety, social adjustment and career planning. He diagnosed Plaintiff with Asperger's disorder, cyclothymia, attention deficit hyperactivity disorder (ADHD) – primarily inattention, and a learning disorder and opined that Plaintiff would be limited in his ability to follow detailed instructions and perform complex tasks. He assigned Plaintiff a current Global Assessment of Functioning (GAF) Score of 45.[2]

In completing the MRFCA, Dr. Thorsen indicated that Plaintiff was "markedly" limited in his ability to understand, remember and carry out detailed instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Dr. Thorsen based his comments and conclusions on his 2011 Psychological Evaluation report which he attached to his responses.

## Testimony and Lay Witness Evidence

### I. Plaintiff

Plaintiff testified that he continues to see Dr. McGlothlin on a regular basis and Dr. Thorsen as needed. He lives with his mother who travels frequently to the East Coast for work. He gets "bogged down" in the house and doesn't leave very often. His mother buys food for him and he prepares sandwiches and frozen foods when she is away. He visits friends or has friends over.  He is not attending community college because of other activities.  He is working with a

---

[2] A GAF in the range of 41–50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." American Psychiatric Ass'n Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000 (DSM–IV–TR).

counselor at Laurel Hill to try and find work and shape his career goals. He had been doing

volunteer work and was registering to work part-time as a personal care attendant.  A short while

before the hearing he had experienced a "little bit of a meltdown," with panic attacks and

increasing anxiety. As a result, he needed to back out of rehearsals for a play and his acting was

"on the back burner." He has difficulty with simplistic tasks because he overthinks them and is

obsessive about how they are done to the extent that it is mentally and emotionally draining.  He

has a good memory and can memorize lines and learn music because those things interest him

but it is very difficult for him to focus and give attention to things that don't interest him. He

plays classical piano. He plans on becoming involved in the theater again in the near future.

## II. Plaintiff's Father's Lay Witness Statement

Plaintiff's father, Timothy Wefler, completed a Third-Party Function Report dated

November 3, 2009. He wrote that he spends two to three hours per week with his son but

sometimes no time during the week.  He described Plaintiff's daily activities as attending school

part-time, working part-time, and caring for his cat. He wrote that Plaintiff required reminder

phone calls from family members to remember schedules, appointments and to take his

medications. Plaintiff does some chores if reminded or prompted to do them or if they are

necessary in order to go to school or work. Mr. Wefler wrote that Plaintiff has a math learning

disability and doesn't understand the value of money.  Plaintiff's hobbies are reading, watching

television, theater and movies and he engages in these activities daily. Plaintiff visits friends'

houses, goes to the movies and goes for walks.  He has difficulty keeping new friends and has

occasions, seemingly triggered by negative thoughts or situations, when he makes inappropriate

comments and doesn't understand why. Mr. Wefler wrote that Plaintiff has trouble concentrating

enough to understand basic instructions, forgets what he is doing and very rarely finishes what he starts.

## ALJ's Decision

At the first step of his disability analysis, the ALJ found that Plaintiff had worked but had not engaged in substantial gainful activity since his application date.

At the second step, the ALJ found that Plaintiff had the following severe impairments: OCD/generalized anxiety disorder/Asperger's disorder, depressive disorder NOS, cyclothymic disorder and a math learning disorder.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the Listings, 20 C.F.R. Part 404, Subpart P., App. 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

The ALJ next assessed Plaintiff's residual functional capacity (RFC). He found that Plaintiff retained the capacity to perform the full range of work at all exertional levels, but was limited to performing more than simple repetitive work but not detailed or complex tasks, should have only intermittent/brief contact with coworkers and the public and should not work in high-paced production jobs. In reaching this conclusion, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not wholly credible.

Because the Plaintiff had no past relevant work, the ALJ did not assess his ability to perform such work.

At step five, the ALJ found that Plaintiff could perform "other work" that existed in significant numbers in the national economy. Based upon testimony from the VE, the ALJ cited usher and shelving clerk as examples of work that Plaintiff could perform. Having concluded

that Plaintiff could perform such work, the ALJ found that Plaintiff was not disabled within the meaning of the Act.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of establishing disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred in failing to fully credit the opinion of his treating psychologist, Dr. Thorsen; failed to provide sufficient reasons for rejecting Plaintiff's testimony

FINDINGS AND RECOMMENDATION – 14

and his father's third-party witness statements regarding the severity of his symptoms and

limitations; and erred in his Step Five finding that Plaintiff could perform "other work."

## I. Evaluating Medical Opinion

Plaintiff contends that the ALJ failed to provide legally sufficient reasons for giving little

weight to Dr. Thorsen's opinion that Plaintiff was "markedly" limited in several areas.

### A. Applicable Standards

The ALJ is required to consider all medical opinion evidence and is responsible for

resolving conflicts and ambiguities in the medical testimony. Tommasetti v. Astrue, 533 F.3d

1035, 1041 (9th Cir.2008). In reviewing an ALJ's decision, the court does not assume the role of

fact-finder, but instead determines whether the decision is supported by substantial evidence in

light of the record as a whole. Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir.1992).

Because treating physicians have a "greater opportunity to know and observe" their

patients, their opinions are given greater weight than the opinions of other physicians. Smolen v.

Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  An ALJ must provide clear and convincing reasons

for rejecting an examining physician's uncontroverted opinions, Lester v. Chater, 81 F.2d 821,

830–31 (9th Cir.1995), and must provide "specific, legitimate reasons ... based upon substantial

evidence in the record" for rejecting opinions of a treating physician which are contradicted.

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989)(citations omitted).

### B. Analysis

In forms dated September 12, 2012, Dr. Thorsen responded to questions from and

completed a checkbox Mental Residual Function Capacity Assessment (MRFCA) provided by

Plaintiff's attorney.  He represented that he had seen Plaintiff and his family intermittently for

counseling since Plaintiff was ten years old.  However, as the ALJ notes, with the exception of

the single evaluation report submitted in support of Dr. Thorsen's opinion, the record contains none of Dr. Thorsen's treatment records.

Because Dr. Thorsen's opinion was contradicted by the opinions of examining and non-examining physicians, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence in the record for giving it little weight. The ALJ here met that requirement.

First, the ALJ noted that although Dr. Thorsen reported that he had treated Plaintiff for a number of years, his opinion was not entitled to the controlling weight typically afforded a treating provider because he did not supply a longitudinal treatment record. The only evidence of record offered in support of Dr. Thorsen's opinion is the evaluation performed in March and April of 2011. Plaintiff argues that Dr. Thorsen's history with Plaintiff is consistent with notations in the treatment records of other mental health providers. However, Plaintiff confuses the existence of a treating relationship with the importance of longitudinal treatment records. Neither the ALJ nor the Commissioner argues that Dr. Thorsen was not a treating physician. However, the record before the ALJ lacked treatment records documenting that the provider has had the "greater opportunity to know and observe" his patient, which is customarily the basis for affording a treating provider's opinion greater weight. See Smolen, 80 F.3d at 1285; Rodriguez v. Bowen, 876 F.2d 759, 761 (9th Cir.1989); See also, Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1038 (9th Cir. 2003)(citing Ratto v. Sec'y, Dep't of Health & Human Servs., 839 F.Supp. 1415, 1425 (D.Or.1993)). The absence of a supporting treatment record was a legitimate basis for the ALJ to decline to give controlling weight to Dr. Thorsen's opinion.

Second, the ALJ gave very limited weight to Dr. Thorsen's opinion because it was unsupported by and inconsistent with all other evidence in the record. The ALJ acknowledged

the marked limitations assessed by Dr. Thorsen on the checkbox form, noting that the opinion was supported by one exam and that Dr. Thorsen's treatment records were unavailable for review.  The ALJ cited, in contrast, an assessment by Dr. William McConochie noting that Plaintiff was succeeding at college and in a job at a performing arts center despite depression and anxiety. Dr. McConochie assessed no social functioning limitations and only mild limitations in the ability to understand and remember instructions and concentration. In a different part of his decision, the ALJ also noted that treating physician Dr. Frank had remarked on Plaintiff's success in school, that he was living independently and that his choices to stay up late and sleep during the day interfered with his class attendance and work and volunteer opportunities.

In support of his evaluation of Dr. Thorsen's opinion, the ALJ also cited records from the Laurel Hill Center that indicated that claimant had obtained employment; was acting in several more plays by May 2012, including a Shakespearean play; had written a play for a student production; and had volunteered backstage for another production.  Laurel Hill counselors described Plaintiff as an aspiring artist who was continuing to develop his career plan and pursue his acting.  His activities included reading books, memorizing lines, performing Shakespeare, and acting in local musical theater productions. The ALJ noted that Plaintiff complained of being bored at various jobs the Laurel Hill counselor arranged for him and at one point not taking a job because of conflicts with piano lessons and his class schedule.  The ALJ also observed that Laurel Hill records indicated that in early 2011 Plaintiff left his job as a production assistant because his own performing schedule was so busy.

The ALJ also noted that Dr. Thorsen's assessment of Plaintiff's limitations was inconsistent with Plaintiff's own acknowledged level of activity.  He noted that the extreme limitations assigned by Dr. Thorsen's were belied by Plaintiff's ability to pursue an acting career,

memorize lines, read and write scripts, play classical music by ear, and work in professional theater productions.

Plaintiff argues that it was error for the ALJ to give more weight to Dr. McConochie's opinion than to that of Dr. Thorsen because Dr. Thorsen was Plaintiff's treating physician and had administered more tests.  Defendant responds that in making such an argument, Plaintiff asks the court to enter into the province of the ALJ and reweigh conflicting evidence.  I agree and decline to do so.  The ALJ's interpretation of the evidence was reasonable and supported by substantial evidence. It, therefore, should not be set aside by this court. See, e.g., Fair v. Bowen, 885 F.2d 587, 604 (9th Cir.1989) (where evidence subject to multiple interpretations, court does not second guess ALJ's reasonable interpretation); see also, Andrews, 53 F.3d at 1039 (ALJ responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities).

Plaintiff also contends that it was error for the ALJ to have not considered the GAF score assigned by Dr. Thorsen. The Commissioner correctly notes that the Agency does not directly correlate the GAF scale to the severity requirements in the listings of mental disorders. See 65 Fed.Reg. 50,746, 50,765 (Aug. 21, 2000)(discussing comments to 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 12.00D).  In his decision, the ALJ discussed that a GAF assessment reflects a clinician's subjective judgment concerning the severity either of an individual's functional impairments *or* symptoms, DSM–IV–TR at 32–33, and that symptoms reflect an individual's description of his or her impairments. SSR 96–7p, available at 1996 WL 374186 at *2. As discussed below, the ALJ here properly found that Plaintiff's description of the severity of his symptoms and impairments was not credible.  It is apparent from his decision that the ALJ considered the GAF score assigned by Dr. Thorsen, but also took into consideration the

FINDINGS AND RECOMMENDATION – 18

limitations based upon Plaintiff's subjective complaints that he did not find credible. <u>Batson v.
Commissioner</u>, 359 F.3d 1190, 1195 (9th Cir.2004)(medical opinion may be rejected when based
upon a claimant's subjective complaints that are properly discredited).

The ALJ provided specific and legitimate reasons supported by substantial evidence in
the record for giving less weight to Dr. Thorsen's opinion.  Accordingly, there was no error.

## II. <u>Plaintiff's Credibility</u>

As noted above, in evaluating Plaintiff's residual functional capacity, the ALJ found that
Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms
were not wholly credible.

## A.  Applicable Standards

The ALJ is responsible for determining credibility, resolving conflicts in medical
testimony, and resolving ambiguities. <u>Andrews</u>, 53 F.3d at 1039. If a claimant produces medical
evidence of an underlying impairment that is reasonably expected to produce some degree of the
symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide
"clear and convincing reasons" for an adverse credibility determination. <u>Smolen</u>, 80 F.3d at
1281; <u>Greger v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir.2006).

The ALJ must examine the entire record and consider several factors, including the
claimant's daily activities, medications taken and their effectiveness, treatment other than
medication, measures other than treatment used to relieve pain or other symptoms, and "any
other factors concerning the individual's functional limitations and restrictions due to pain or
other symptoms." SSR 96–7. An ALJ may consider such factors as a claimant's inconsistent
statements concerning his symptoms and other statements that appear less than candid,
unexplained or inadequately explained failure to seek treatment or follow a prescribed course of

treatment, medical evidence tending to discount the severity of the claimant's subjective claims, and vague testimony as to the alleged disability and symptoms. <u>Tommasetti</u>, 533 F.3d at 1040.

If substantial evidence supports the ALJ's credibility determination, it must be upheld, even if some of the reasons cited by the ALJ are not correct. <u>Carmickle v. Commissioner of Social Security</u>, 533 F.3d 1155, 1162 (9th Cir. 2008).

**B. Analysis**

Plaintiff here produced medical evidence of underlying impairments that could reasonably be expected to produce some of the symptoms he alleged, and there was no evidence of malingering.  The ALJ was therefore required to provide clear and convincing reasons for concluding that he was not wholly credible.

In support of his credibility determination, the ALJ asserted that Plaintiff's allegations of disabling anxiety/OCD symptoms, disorganized thinking, racing thoughts and difficulty performing even simple tasks were not consistent with his activities of daily living. The ALJ noted that Plaintiff was "very active," attending community college, writing and acting in plays, taking piano and voice lessons, playing video games, working in a local performing arts complex, living independently and socializing with friends. He acknowledged that Plaintiff had difficulties in one of his school terms and received disability services at college. However, the ALJ noted that treatment notes indicated that Plaintiff's disorganized lifestyle, and his choosing to stay up late at night and sleep during the day interfered with his school and work opportunities. The ALJ noted that the record indicated that Plaintiff chose to engage in activities that interested him, had been encouraged to do what he liked, and had failed to pursue more conventional employment despite suggestions and assistance from counselors. These were acceptable bases upon which to discount Plaintiff's credibility. <u>See</u> <u>Lingenfelter v. Astrue</u>, 504

FINDINGS AND RECOMMENDATION – 20

F.3d 1028, 1040 (9th Cir.2007) (activities inconsistent with alleged symptoms relevant to credibility determination); Turner v. Commissioner, 613 F.3d 1217, 1225 (9th Cir.2010) (even activities performed with some difficulty can undermine claimant's allegations of totally disabling impairment).

The ALJ also cited Plaintiff's noncompliance with treatment recommendations and inconsistent adherence to his medication regimen as evidence that his testimony concerning the severity of his impairments was not wholly credible. The ALJ noted that Plaintiff's treating physician, Dr. Frank indicated that Plaintiff was not always compliant with recommendations to see his therapist.  Plaintiff contends that there is evidence in the record that visits to Dr. Thorsen were expensive even with insurance coverage and that Plaintiff, therefore, usually saw Dr. Thorsen when he was having the most difficulty. Under the circumstances, Plaintiff's failure to obtain regular treatment from Dr. Thorsen does not undermine his testimony concerning the severity of his limitations. See Smolen, 80 F.3d at 1284 (claimant's failure to seek treatment he cannot afford not proper basis for discounting credibility).  Likewise, Plaintiff's inconsistent adherence to his medication regimen was not a proper basis for discounting his credibility. There is evidence in the record that Plaintiff required help remembering to take his medication. Although the Commissioner now argues that the record "clearly indicates" that this was due to "willful non-compliance," the ALJ did not make such an assertion and, in any event, the citations to the record provided by the Commissioner in support of her argument are not persuasive. See Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir.2001)(court cannot affirm Commissioner's decision on grounds that the ALJ did not invoke).

Though he cited some inadequate reasons for discounting Plaintiff's credibility, the ALJ cited other clear and convincing reasons for his credibility determination, and his assessment was

supported by substantial evidence. Under these circumstances, the credibility determination

should be upheld. See, e.g., Carmickle, 533 F.3d at 1162 (where supported by substantial

evidence, ALJ's credibility determination upheld even if some reasons offered are incorrect).

## III. Lay Witness Evidence

Plaintiff asserts that the ALJ gave no germane reasons for failing to credit the evidence

presented in the Third-Party Report completed by his father, Timothy Wefler. Plaintiff argues

that the ALJ violated the requirements of Valentine v. Barnhart, 574 F.3d 685, 694 (9th Cir.

2009), by failing to tie his reasoning to the particular witness whose testimony he was rejecting

and erred in not acknowledging any of the limitations identified by the lay witness.

I disagree. The ALJ specifically indicated that he found the third party statements from

Plaintiff's mother and father less than wholly credible for the same reasons he discounted

Plaintiff's testimony.  The ALJ then went on, as discussed above, to describe those reasons in

detail. The ALJ rejected the third-party statements in part on the grounds that they were

inconsistent with Plaintiff's activities of daily living.  The ALJ discussed those activities at

length in his decision and his conclusion that they were inconsistent with the lay witness

evidence was reasonable and constituted a "germane" reason for rejecting the third-party

statements. See, e.g., Carmickle, 533 F.3d at 1163–64 (inconsistency between claimant's

activities and lay witness's statements is germane reason for discrediting the lay witness).

## IV. Step Five Findings

Plaintiff contends that the hypothetical the ALJ posed to the VE was incomplete because

it failed to include the marked limitations and accommodations identified by Dr. Thorsen as well

as the limitations alleged in the lay witness statements and Plaintiff's own testimony.  Plaintiff

also argues that the occupations of usher and shelving clerk identified by the VE as "other work"

Plaintiff could perform are inconsistent with the ALJ's finding that Plaintiff should only have intermittent/brief contact with the public.

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments. Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir.1984) (citing Baugus v. Secretary, 717 F.2d 443, 447 (8th Cir.1983)). The ALJ's depiction of the claimant's limitations set out in the hypothetical must be "accurate, detailed, and supported by the medical record." Tackett, 180 F.3d at 1101. If an ALJ presents a hypothetical to a VE that does not reflect all of the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy. Embrey v. Bowen, 849 F.2d 418, 423 (9th Cir.1988).

Plaintiff's contention that the hypothetical posed by the ALJ was incomplete and therefore did not constitute substantial evidence is unpersuasive. As discussed above, the ALJ properly discounted Dr. Thorsen's opinion, lay-witness statements, and Plaintiff's subjective complaints of disabling symptoms. Accordingly, he was entitled to rely on VE testimony based on a hypothetical that included only those limitations supported by the record. See Osenbrock v. Apfel, 240 F.3d 1157, 1163–65 (9th Cir.2001)(only limitations supported by substantial evidence must be incorporated into RFC and dispositive hypothetical question posed to VE).

Furthermore, Plaintiff offers no argument or evidence to support his conclusory assertion that the occupations of shelving clerk and usher are inconsistent with his determined RFC. I conclude that the ALJ here was entitled to rely upon the expertise of the VE regarding the occupations Plaintiff was able to perform. See Osenbrock, 240 F.3d at 1163 ("The testimony of a vocational expert constitutes substantial evidence supporting an ALJ's decision."); see also Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides

FINDINGS AND RECOMMENDATION – 23

the necessary foundation for his or her testimony."). Accordingly, the ALJ's decision was supported by substantial evidence and should be affirmed.

## Conclusion

For the reasons set out above, a Judgment should be entered AFFIRMING the Commissioner's decision and DISMISSING this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due April 14, 2016. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 28th day March, 2016.


_____/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION – 24